**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SPECIFIX FASTENERS PTY. LTD, et al. | ) | CASE NO. 1:15 CV 01366 |
| | ) | |
| Plaintiffs | ) | JUDGE:  CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | **MEMORANDUM  IN OPPOSITION TO** |
| | ) | **DEFENDANTS' MOTION TO DISMISS** |
| ALLFASTENERS USA LLC, et al. | ) | **FOR LACK OF STANDING AND** |
| | ) | **FAILURE TO STATE A CLAIM** |
| Defendants. | ) | |

Now come Specifix Fasteners Pty. Ltd. ("Specifix"), ACME Equipment Pty. Ltd. ("Equipment"), and ACME Operations Pty. Ltd. /dba/ AJAX Engineered Fasteners and /dba/ AJAX Fasteners ("Ajax"), (collectively "Plaintiffs"), by and through the undersigned counsel and submit this Memorandum in Opposition to the Motion to Dismiss filed by Defendants AllFasteners USA LLC, AllFasteners Enterprises LLC, and AllFasteners LA LLC (collectively "Defendants" or "AllFasteners").

As more fully explained in this Memorandum, Defendants have failed to meet the standards necessary to prevail on the Motion to Dismiss and their Motion should be denied.

Dated:  December 1, 2015

                                        Respectfully submitted,


                                        */s/ Robert W. McIntyre*
                                        ROBERT W. McINTYRE (0006768)
                                        ANGELA M. LAVIN (0069604)
                                        PETER A. HOLDSWORTH (0075211)
                                        Wegman Hessler & Vanderburg
                                        6055 Rockside Woods Blvd, Suite 200
                                        Independence, OH  44131
                                        Telephone:  (216) 642-3342 / Fax:  (216) 642-8826
                                        Email: rwmcintyre@wegmanlaw.com

amlavin@wegmanlaw.com
pxholdsworth@wegmanlaw.com

***Attorneys for Plaintiffs***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy the foregoing *Memorandum in Opposition to Defendants'
Motion to Dismiss for Lack of Standing and Failure to State A Claim* was filed electronically this
1st day of December, 2015.  Notice of this filing will be sent by operation of the Court's
electronic system to all parties indicated on the electronic filing receipt.  Parties may access this
filing through the Court's ECF system.

*/s/ Robert W. McIntyre*
ROBERT W. McINTYRE (0006768)

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   THE FACTS ....................................................................................................... 1

    A.   Ajax Manufactures And Sells High-Quality Blind Structural Fasteners. ................... 1

    B.   AllFasteners Was An Authorized Re-Seller Of Ajax's OneSide Products. ................ 2

    C.   AllFasteners Misappropriated Ajax's Technology And Trade Secrets ...................... 4

    D.   AllFasteners Engaged In Infringing And Deceptive Conduct In Marketing And Selling Its Competing NexGen2 Products ....................................................... 5

III. LAW AND ARGUMENT ..................................................................................... 6

    A.   Legal Standards .......................................................................................... 6

        1.   Article III Standing ............................................................................. 7

        2.   Subject Matter Jurisdiction Under Federal Civil Rule 12(b)(1) .................... 8

        3.   Failure To State A Claim for Relief Under Federal Civil Rule 12(b)(6) ........... 9

    B.   Plaintiffs Have Satisfied the Standing And Pleading Requirements Applicable To The Patent Infringement Claim In Count I of the Second Amended Complaint. .......................... 10

        1.   Plaintiffs Satisfy Standing Requirements Applicable To The Patent Infringement Claim. ........ 10

        2.   AllFasteners' Claim That A Method Claim Cannot Be Infringed By The Manufacture And Sale Of A Product Is Incorrect. ........................................ 13

        3.   Plaintiff Properly Stated a Cause of Action. ............................................ 16

        4.   Infringement Under the Doctrine of Equivalents. ..................................... 17

    C.   Plaintiffs Have Satisfied the Standing and Pleading Requirements Applicable To Its Claims Under the Lanham Act ....................................................................... 19

        1.   Plaintiffs Have Sufficiently Pled A Claim Of Trade Dress Infringement. ........ 21

        2.   Plaintiffs Have Sufficiently Pled A Claim Of False Advertising. .................. 23

    D.   Plaintiffs Have Satisfied the Standing and Pleading Requirements Applicable To Its Claims Under Ohio's Uniform Trade Secret Act. ...................................... 24

    E.   Plaintiffs Have Satisfied the Standing and Pleading Requirements Applicable To Its Claims For Breach of Contract. ............................................................ 26

IV. CONCLUSION .................................................................................................. 27

## <u>Table of Authorities</u>

**Cases**

*Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*,
   280 F.3d 619 (6th Cir. 2002)............................................................... 22

*Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*,
   878 F.2d 806 (5th Cir. 1989)............................................................... 21

*Am. Coe. Ass'n v. City of Louisa Water & Sewer Comm'n.*,
   2009 U.S. Dist. LEXIS 131652 (E.D. Ky. Feb. 27, 2009) 7

*Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery,
   Inc.*, 185 F.3d 606 (6th Cir. 1999)..........................................................20

*Aquatex Indus., Inc. v. Techniche Solutios*,
   419 F.3d 1374 (Fed. Cir. 2005)............................................................ 18

*Arachnid, Inc. v. Merit Indus., Inc.*,
   939 F.2d 1574 (Fed. Cir. 1991)............................................................ 10

*Ashcroft v. Iqbal*,
   556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) ....................... 10

*Bassett v. Nat'l Collegiate Athletic Ass'n*,
   528 F.3d 426 (6th Cir. 2008)............................................................ 9, 10

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007) ....................... 10

*Bell Intercontinental Corp. v. United States*,
   180 Ct. Cl. 1071, 281 F.2d 1004 (1967) ................................................ 12

*Belmora LLC v. Bayer Consumer Care AG*,
   84 F. Supp.3d 490 (E.D. Va. 2015)........................................................20

*Board of Trustees v. City of Painesville*,
   200 F.3d 396 (6th Cir. 1999)................................................................ 8

*Cleveland Branch, N.A.A.C.P. v. City of Parma*,
   263 F.3d 513 (6th Cir. 2001)................................................................ 7

*Cleveland Branch, NAACP v. City of Parma*,
   263 F.3d 513 (6th Cir. 2001)................................................................ 7

*Courtney v. Smith*,
  297 F.3d 455 (6th Cir. 2002) ............................................................................. 7

*Crown Die & Tool C. v. Nye Tool & Machine Works*,
  261 U.S. 24, 67 L. Ed. 516, 43 S. Ct. 254, 1923 Dec. Comm'r Pat. 651 (1923) ...................... 11

*Dayco Prods., LLC v. Dorman Prods.*,
  2010 U.S. Dist. LEXIS 102785, 2010-2 Trade Cas. (CCH) P77,291, 2010 WL 3855221 ( E.D.
  Mich. Sept. 28, 2010) .......................................................................... 22

*DeBoer Structures Inc. v. Shaffer Tent & Awning Co.*,
  233 F. Supp. 2d 934 (S.D. Ohio 2002) ....................................................... 24

*DLX, Inc. v. Kentucky*,
  381 F.3d 511 (6th Cir. 2004) ............................................................................. 9

*Fabian v. Fulmer Helmets Inc.*,
  628 F.3d 278 (6th Cir. 2010) ........................................................................ 10

*Fabpro Oriented Polymers, Inc. v. McCormick*,
  2002 U.S. Dist. LEXIS 9224 (W.D. Mich. May 7, 2002) .................................. 10

*Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts*,
  944 F.2d 1235 (6th Cir. 1991) ......................................................................... 21

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kaburshiki Co. Ltd.*,
  535 U.S. 722, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002) ................................... 18

*Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
  339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, 1050 Dec. Comm.'r Pat. 597 (1950) ................. 18

*Greater Cincinnati Coalition of the Homeless v. City of Cincinnati*,
  56 F.3d 710 (6th Cir. 1995) ............................................................................. 8

*Gunasekera v. Irwin*, 551 F.3d 461 (6th Cir. 2009) ...................................... 10

*H.R. Technologies, Inc. v. Astechnologies, Inc.*, 275 F.3d 1378 (Fed. Cir. 2002.) ................... 11

*Heartland Home Fin., Inc. v. Allied Home Mortgage Capital Corp.*, 258 F. App'x 860 (6th Cir.
  2008) ......................................................................................................... 24

*Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*,
  270 F.3d 298 (6th Cir. 2001) ........................................................................ 23

*Hilgraeve Corp. v. Symantec Corp.*,
  212 F.R.D. 345 (E.D. Mich. 2003) ................................................................ 7

vi

*Int'l Diamond Imps., Inc. v. Oriental Gemco Ny, Inc.,*
  64 F. Supp. 3d 494 (S.D.N.Y. 2014) ................................................................... 22

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,*
  58 F.3d 27 (2d Cir. 1995) ................................................................................... 21

*Kobaivanova v. Hansen,*
  2011 U.S. Dist. LEXIS 105252 (N.D. Ohio Sept. 16, 2011) ................................... 9

*Landscape Forms, Inc. v. Columbia Cascade Co.,*
  113 F.3d 373 (2d Cir. 1997) ............................................................................... 22

*Lans v. Digital Equipment Corp.,*
  252 F.3d 1320 (Fed. Cir. 2001) .......................................................................... 10

*Lexmark Internaitional Inc. v. Static Control,* 134 S.Ct. 1377, 188 L.Ed.2d 392; 2014 US LEXIS
  2214 (2014) ....................................................................................................... 20

*Mayer v. Mylod,*
  988 F.2d 635 (6th Cir. 1993) ................................................................................ 9

*Mertik Maxitrol GMBH & Co. KG v. Honeywell Techs. Sarl,*
  2012 U.S. Dist. LEXIS 29264 ( E.D. Mich. Mar. 6, 2012) ................................... 22

*Metro Hydroelectric Co., LLC v. Metro Parks,*
  541 F.3d 605 (6th Cir. 2008) ................................................................................ 8

*MGM Studios Inc. v. Grokster, Ltd.,*
  545 U.S. 913, 932, 125 S.Ct. 2764 (2005) ................................................... 15, 16

*Michigan S. R.R. Co. v. Branch & St. Joseph Counties Rail Users Ass'n, Inc.,*
  287 F.3d 568 (6th Cir. 2002) ................................................................................ 8

*Mike Vaughn Custom Sports, Inc. v. Piku,*
  15 F. Supp. 3d 735 (E.D. Mich. 2014) .................................................... 10, 22, 23

*Moher v. United States,* 875 F. Supp. 2d
  739 (W.D. Mich. 2012) ......................................................................................... 8

*Moir v. Cleveland Reg'l Transit Auth.,*
  895 F.2d 266 (6th Cir. 1990) ................................................................................ 8

*Nat'l Steel Car Ltd. v. Canadian Pac Ry Ltd,*
  357 F3d 1319 (Fed. Cir. 2004) ........................................................................... 19

*Northwest Ohio Props. v. Lucas Cnty.*,
  2015 U.S. Dist. LEXIS 84882 (N.D. Ohio June 30, 2015) ...................................... 8

*Ohio Nat'l Life Ins. Co. v. United States*,
  922 F.2d 320 (6th Cir. 1990) .................................................................................. 9

*Renteria-Villegas v. Metro. Gov't*,
  796 F. Supp. 2d 900 (M.D. Tenn. 2011) ................................................................ 7

*Ricoh Co. Ltd v Quanta Storage Inc.*,
  550 F3d 1325 (Fed. Cir. 2008) ............................................................................. 14

*Rippy ex rel. Rippy v. Hattaway*,
  270 F.3d 416, 419 (6th Cir. 2001) .......................................................................... 9

*Schutte Bagclosures Inc. v. Kwik Lok Corp.*,
  48 F. Supp.3d 675 (S.D.N.Y. 2014) ...................................................................... 21

*Shoemake v. Mansfield City Sch. Dist. Bd. of Educ.*,
  61 F. Supp. 3d 704 (N.D. Ohio 2014) ................................................................. 9, 10

*TherDow Corning Corp. v. Jie Xiao*,
  2011 U.S. Dist. LEXIS 54619, 101 U.S.P.Q.2D (BNA) 1802 ( E.D. Mich. May 20, 2011).... 20

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
  532 U.S. 23, 121 S. Ct. 1255, 149 L. Ed. 2d 164 (2001) ...................................... 22

*United States v. Ritchie*,
  15 F.3d 592 (6th Cir. 1994) ................................................................................... 8, 9

*Vaupel Textilmashin Kg v. Meccanica Euro Italia SpA*,
  944 F.2d 870, 875 (Fed. Cir. 1991) ...................................................................... 12

*Wald et al v Mudhopper Oil Field Services Inc.*,
  2006 U.S. Dist. LEXIS 51666 (W.D. Okla. July 27, 2006) .................................. 18

*Warth v. Seldin*, 4
  22 U.S. 490, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975) ......................................... 7

*Wellington Res. Group LLC v. Beck Energy Corp.*,
  2013 U.S. Dist. LEXIS 134835 (S.D. Ohio Sept. 20, 2013) ............................. 24, 25

*Zurich Insurance Co. v. Logitrans Inc.*,
  297  F3d. 528 (6th Cir. 2002) ............................................................................... 7

viii

**Statutes and Regulations**

15 U.S.C. § 1125(a)(1).................................................................................................. 19, 20, 23

15 U.S.C. §1927............................................................................................................ 20

35 U.S.C. §261............................................................................................................ 11, 12

35 U.S.C. §271(b) ........................................................................................................ 13

35 U.S.C. §271(c) ........................................................................................................ 14

35 USC §100(d) ........................................................................................................... 11

Ohio Rev. Code § 1333.61............................................................................................ 24

**Rules**

Fed. R. Civ. P. 12(b)(1)................................................................................................. 8

Fed. R. Civ. P. 15(c)(2)................................................................................................. 7

## MEMORANDUM IN OPPOSITION TO DEFENDANTS'
## MOTION TO DISMISS

### I.      INTRODUCTION

This action arises due to AllFasteners' infringement of U.S. Patent 7,363,709, its attempt to utilize confidential and proprietary information it gained from Plaintiffs during a four-year business relationship in order to unfairly compete with Plaintiffs, and for additional unfair business practicies. Ajax filed suit against AllFasteners on July 9, 2015 asserting claims for patent infringement, violations of the Lanham Act, theft of trade secrets and breach of contract. (Doc. 1.) AllFasteners filed their Answer and Counterclaim (Doc. 14) on July 31, 2015.

In accordance with the Order of the Court dated October 21, 2015 (Doc.31) and as agreed upon by the parties in their Report of Parties Planning Meeting (Doc. 30), Plaintiffs amended their pleadings in the case by filing the First and Second Amended Complaints so as to  more clearly identify Ajax and its business (trading) names as well as to articulate in greater detail the relationship between Ajax and its affiliated corporate entities with respect to the intellectual property rights and trade secret protections at issue in this case.  (Docs. 35,37.)  Though Specifix and Equipment have been added to this action, the alleged conduct at issue in this case and the claims for recovery against AllFasteners remain unchanged from the Complaint. (*Compare* Doc. 1 and Doc. 37.)

On November 9, 2015, AllFasteners filed their Motion to Dismiss.  (Doc. 38.)  Plaintiffs file the instant opposition in accordance with the briefing schedule approved by the Court.

### II.     THE FACTS

#### A.      Ajax Manufactures And Sells High-Quality Blind Structural Fasteners.

Ajax is an Australian corporation in the business of designing, engineering, manufacturing, testing and certifying various types of fasteners under its ONESIDE™ Structural Fastener brand

(hereafter "OnSide"). (Doc. 37, Second Amended Complaint, ¶17.) The OneSide fastener is used for the construction of cellular telephone antenna towers, wind turbine towers, pressure vessels and other steel structures.  (Doc. 37, Second Amended Complaint at Exhibit B thereto, compilation of excerpts from Ajax's website.)

The OneSide fasteners consist of a special combination of bolt, washer and installation tool that permit the bolt to be installed and tightened in holes in steel structures where the "head" of the bolt is not accessible to tools.  (Doc. 37, Second Amended Complaint, ¶¶19,20.)  These types of fasteners are generically called "blind bolts" or "blind hole bolts."  (*Id.*)

The OneSide bolt product and method of operation are the subject of a patent issued by the U.S. Patent and Trademark Office under Patent No. 7,373,709  ("the '709 Patent") owned by Equipment, an affiliate of Ajax and a wholly owned subsidiary of Specifix. (Doc. 37, Second Amended Complaint ¶1, 5.) Equipment has authorized Ajax alone to use, mark and enforce the '709 Patent. (Doc. 37, Second Amended Complaint ¶22.)  And, with that exclusive authority, Ajax manufacturers and sells the OneSide product line, incorporating the inventions described in the '709 Patent.  (Doc. 37, Second Amended Complaint, ¶23.)

### B.  AllFasteners Was An Authorized Re-Seller Of Ajax's OneSide Products.

AllFasteners is a general industrial fastener distributor. (Doc 1, Complaint, ¶26; Doc. 37, Second Amended Complaint, ¶31.)  Beginning in 2012, AllFasteners served as one of only two exclusive authorized re-sellers of the OneSide fasteners in the United States.  (Doc 1, Complaint ¶¶25, 27; Doc. 37, Second Amended Complaint, ¶33.)  In this relationship, AllFasteners obtained exclusively from Ajax, genuine OneSide products, which it resold to its end-user customers in the United States. (Doc 1, Complaint ¶29; Doc. 37, Second Amended Complaint, ¶34.) (*Id.*)  The commercial arrangements between Ajax and AllFasteners contemplated the factory-direct sale of

2

the genuine Ajax OneSide to AllFasteners for resale to end-users. (Doc 1, Complaint ¶31; Doc. 37, Second Amended Complaint, ¶36.) Neither Ajax nor Equipment ever authorized AllFasteners to manufacture fasteners (directly or through a third party) or to sell any fasteners using the patented inventions of the Ajax OneSide. (*Id.*)

As a result of their commercial relationship, AllFasteners received access to substantial amounts of engineering, material specifications, manufacturing technology and know-how, application information and other information which Ajax would not ordinarily disclose to the public. (Doc 1, Complaint ¶39; Doc. 37, Second Amended Complaint, ¶43,44.) To facilitate the exchange of information among them, the parties entered into a Confidentiality Agreement on March 5, 2013, which states in pertinent part:

> A.     Ajax Fasteners and [AllFasteners] wish to engage in confidential discussions concerning business development.
>
> B.     To facilitate these discussions it will be necessary for Ajax and [AllFasteners] to exchange proprietary and confidential information ***."
>
> ***
>
> 2. *** The Receiving Party [here, AllFasteners] hereby undertakes:-
>           a) to treat all such Proprietary Information as strictly confidential; and
>           b) not to disclose any Proprietary Information in any way to any third party or person without the consent of [Ajax] nor to any employee of [AllFasteners] except as is necessary for the purpose [of the Agreement]; and
>
> ***
>
>           d) not to use any Proprietary Information in any way except to facilitate the Purpose;
>
> ***

(Doc. 37, Second Amended Complaint at Exhibit I, p. 1.) The Confidentiality Agreement further

defined "Proprietary Information" to include the following:

> *** financial information, details of plant and processes, reports, drawings, operating methods and instructions, formulations, projections, plans, specifications, know-how, techniques, manuals, intellectual property and the like both written and unwritten.

(*Id*.)

Late in 2014, Ajax became aware that AllFasteners had made and intended to sell a near-exact copy of the OneSide, which it called "NexGen," and, on November 26, 2014, Ajax confronted AllFasteners about its "NexGen 1" product.  (Doc. 37, Second Amended Complaint, ¶49.)  At the time, AllFasteners assured Ajax that it "scrapped" the NexGen project and would continue to buy and re-sell genuine Ajax One-Side fasteners.  (Doc. 37, Second Amended Complaint, ¶50.)  And, in January 2015, AllFasteners requested Ajax's confidential records related to certifications of steel type, source, chemical composition, and other manufacturing, testing and engineering information.  (Doc. 37, Second Amended Complaint, ¶51.)

Contemporaneously with AllFasteners' request, Ajax sought to formalize the parties' commercial arrangement with a written distribution agreement that included a prohibition against competition between Plaintiffs and AllFasteners.  (Doc. 37, Second Amended Complaint, ¶52.)

### C.    AllFasteners Misappropriated Ajax's Technology And Trade Secrets

Notwithstanding the assurances provided by AllFasteners to Ajax in November 2014, by February 2015, AllFasteners apparently introduced its second version of an infringing bolt and tool, calling it the "NexGen2."  (Doc. 37, Second Amended Complaint, ¶53.)  As demonstrated by the illustrations included within the Second Amended Complaint and the images and videos attached as exhibits to the Second Amended Complaint, the NextGen2 is functionally and visually indistinguishable from Ajax's genuine OneSide blind bolt fastener with only trivial changes to the application tool that incorporated Ajax's confidential and proprietary product information.  (Doc.

37, Second Amended Complaint, ¶58 and Exhibits J and K.)

The images and installation video included in the Second Amended Complaint also demonstrates that in developing the NexGen2 blind bolt fastener, AllFasteners copied each of the essential, unique, and patented features of the OneSide, including the enlarged head, threaded tail, foldable washer, and the use of an application tool to insert and affix the fasteners into the subject steel structure through the blind space. (*Id.*)

Indeed, any differences between the application tools for the genuine OneSide and the infringing NexGen2 fasteners are insubstantial and trivial. Specifically, the genuine OneSide fastener consists of a hard collar, nut, and folding washer. (*Id.*) The tip of the OneSide bolt snaps into the genuine installation tool; the nut, collar and washers (and optional spring, if present) are fed onto the tool; the folding washer is bent into a special recessed area on the installation tool; and the entire assembly is installed and tightened. (*Id.*) With only one minor exception (i.e., the attachment tip) the fastener assembly, the installation tool, and the installation steps for the NextGen2 are identical to the OneSide. (*Id.*)

**D.      AllFasteners Engaged In Infringing And Deceptive Conduct In Marketing And Selling Its Competing NexGen2 Products**

AllFasteners has also engaged in numerous acts in the marketing and sale of the NexGen2 that are intended to confuse and deceive consumers into erroneously believing that AllFasteners' NexGen2 blind structural fasteners are genuine Ajax products. Indeed, AllFasteners has been one of only two authorized resellers of the genuine patented Ajax OneSide fastener in the United States. (Doc. 37, Second Amended Complaint, ¶¶30.) And, the images from its website demonstrate that AllFasteners has mimicked Ajax's color, style and typeface, format, content, and overall impression. (Doc. 37, Second Amended Complaint, ¶¶58,78, 84 and Exhibits J and K.) Thus, AllFasteners is trading upon the reputation and identity of Ajax and its genuine OneSide products.

(Doc. 37, Second Amended Complaint, ¶78.)

At the same time, however, AllFasteners has misrepresented the nature and quality of its NexGen2 products, claiming that they are "made in the USA," that they meet the requirements of the Fastener Quality Act, and that they meet industry standards.  (Doc. 37, Second Amended Complaint, ¶59.)  Yet, these representations are completely unsupported.  (Doc. 37, Second Amended Complaint, ¶¶62, 64, 65, 66, 70, 71, 74.)

The misrepresentations made by AllFasteners and the other conduct described above, have a direct and adverse impact on Ajax.  Using the above identified Ajax technical information, AllFasteners makes and sells a visually indistinguishable, yet inferior, product in competition with Ajax.  (Doc. 37, Second Amended Complaint, ¶79.)  Moreover, AllFasteners has misappropriated the reputation carefully developed by Ajax for the OneSide brand products by marketing the NexGen2 in such a manner as to deceive and confuse the public that its NexGen2 is a new and improved version of the OneSide.  (Doc. 37, Second Amended Complaint, ¶96, 97, 98.)

Now, AllFasteners attempts to avoid liability for its conduct, not by defending against the merits of Ajax's claims – which they cannot, but by asserting that Plaintiffs lack standing sufficient to pursue their claims, that the Court lacks subject matter jurisdiction, and that Plaintiffs have failed to sufficiently plead their case.  As demonstrated below, none of the assertions have merit, and AllFasteners' Motion should be overruled in its entirety.

## III.   LAW AND ARGUMENT

### A.    Legal Standards

Defendants bring their Motion under three separate theories – lack of standing under Art. III, lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), and failure to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6).  In their Motion, however, AllFasteners' misstates and misapplies the legal standards applicable to these defenses.

1.    Article III Standing

In order to pursue a claim in federal court, a party seeking relief must have standing to sue. " 'The constitutional requirements for standing emanate from Art. III, § 2, of the U.S. Constitution, which grants federal courts jurisdiction over cases and controversies'." *Hilgraeve Corp. v. Symantec Corp.,* 212 F.R.D. 345, 347 (E.D. Mich. 2003), quoting *Zurich Insurance Co. v. Logitrans Inc.*, 297 F3d. 528, 531 (6th Cir. 2002).

To satisfy the Art. III requirements, a plaintiff must show it suffered an "injury in fact," which is "particularized and concrete" and "actual or imminent;" that is traceable to "the challenged actions of the defendant;" and that is likely to be "redressed by a favorable decision." *Cleveland Branch, NAACP v. City of Parma,* 263 F.3d 513, 523-524 (6th Cir. 2001).

The Supreme Court has defined standing generally as "the question of . . . whether the litigant is entitled to have the court  decide the merits of the dispute or of particular issues." *Renteria-Villegas v. Metro. Gov't*, 796 F. Supp. 2d 900, 905 (M.D. Tenn. 2011), quoting *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197, 45 L. Ed. 2d 343 (1975).

Standing must exist at the time the complaint is filed.[1] *Renteria-Villegas*, 796 F. Supp. 2d at  905, quoting *Cleveland Branch, N.A.A.C.P.*, 263 F.3d at 524-526.   "For purposes of ruling on a motion to dismiss for want of standing, [the court] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth*, 422 U.S. at 501.   *See also  Courtney v. Smith*, 297 F.3d 455, 459 (6th Cir. 2002); *Greater Cincinnati*

---

[1] Where, as in the present case, the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the original complaint. Fed. R. Civ. P. 15(c)(2).  Though the Second Amended Complaint provides for the addition of Specifix and Equipment, these entities are Ajax's corporate affiliates and are all under common control. They are, in essence, proceeding as one entity seeking only one prayer for relief as to Ajax in particular.  *See e.g.* Doc. 37, Second Amended Complaint, pp.23-24; *Am. Coe. Ass'n v. City of Louisa Water & Sewer Comm'n.*, 2009 U.S. Dist. LEXIS 131652 at *28-30 (E.D. Ky. Feb. 27, 2009).

*Coalition of the Homeless v. City of Cincinnati*, 56 F.3d 710, 715 (6th Cir. 1995).  "At the same time, however, the court may allow or require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing." *Warth*, 422 U.S. at 501. "If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed." *Id*. at 502.

2.     Subject Matter Jurisdiction Under Federal Civil Rule 12(b)(1)

Where subject matter jurisdiction is challenged under Rule 12(b)(1), the plaintiff bears the burden of proving jurisdiction. *Northwest Ohio Props. v. Lucas Cnty.*, 2015 U.S. Dist. LEXIS 84882 (N.D. Ohio June 30, 2015), citing *Moir v. Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).

Rule 12(b)(1) motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks. Fed. R. Civ. P. 12(b)(1); *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). A facial attack challenges the sufficiency of the pleading itself. Where the Rule 12(b)(1) motion presents a facial attack, the Court accepts the material allegations in the complaint as true and construes them in the light most favorable to the nonmoving party, similar to the standard for a Rule 12(b)(6) motion. *Ritchie*, 15 F.3d at 598. For a facial attack, the plaintiff can survive a Rule 12(b)(1) motion to dismiss by showing that the complaint alleges a claim cognizable under federal law, and the claim is "substantial."[2] *Moher v. United States*, 875 F. Supp. 2d 739, 748-49 (W.D. Mich. 2012). A plaintiff can survive a facial attack by showing any arguable basis in the law for his claims. *Metro Hydroelectric*, 541 F.3d at 610-12; *Board of Trustees v. City of Painesville*, 200 F.3d 396, 398 (6th Cir. 1999).

_____

[2] A claim is substantial unless prior court decisions inescapably render it frivolous. *Metro Hydroelectric Co., LLC v. Metro Parks*, 541 F.3d 605, 610-11 (6th Cir. 2008); *Michigan S. R.R. Co. v. Branch & St. Joseph Counties Rail Users Ass'n, Inc.*, 287 F.3d 568 (6th Cir. 2002)).

In contrast, a factual attack is "not a challenge to the sufficiency of the pleading's allegation, but a challenge to the factual existence of subject matter jurisdiction." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). Where the motion presents a factual attack, the allegations in the complaint are not afforded a presumption of truthfulness, and the Court weighs the evidence to determine whether subject matter jurisdiction exists. On a factual attack, the Court has broad discretion to consider extrinsic evidence, including affidavits and documents, and can conduct a limited evidentiary hearing if necessary. *See DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004); *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990).

A dismissal under 12(b)(1) allows for the possibility of re-pleading the action to bring it within the subject matter jurisdiction of the court. *Kobaivanova v. Hansen*, 2011 U.S. Dist. LEXIS 105252, 2011 WL 4401687 (N.D. Ohio Sept. 16, 2011)

### 3. Failure To State A Claim for Relief Under Federal Civil Rule 12(b)(6)

"The purpose of Rule 12(b)(6) is to allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief if all the facts and allegations in the complaint are taken as true." *Rippy ex rel. Rippy v. Hattaway*, 270 F.3d 416, 419 (6th Cir. 2001) (citing *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993)). Under Rule 12(b)(6), the complaint is viewed in the light most favorable to the plaintiffs, the allegations in the complaint are accepted as true, and all reasonable inferences are drawn in favor of the plaintiffs. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

"The measure of a Rule 12(b)(6) challenge--whether the Complaint raises a right to relief above the speculative level—'does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face'.'" *See Shoemake v. Mansfield City Sch. Dist. Bd. of Educ.*, 61 F. Supp. 3d 704, 720 (N.D. Ohio 2014) quoting Bassett, , 528 F.3d

at 430 (6th Cir. 2008).   Simply, a plaintiff must plead enough facts to state a claim for relief that is plausible on its face.  *Id*., quoting in part *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-556, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

Under this standard, examination of a complaint must take into consideration the principles set forth in Civil Rule 8(a)(2) which requires only a short and plain statement of the claim showing that the pleader is entitled to relief.  *Shoemake*, 61 F. Supp.3d at 720, citing *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) "[A]s long as a court can 'draw the reasonable inference that the defendant is liable for the misconduct alleged,' a plaintiff's claims must survive a motion to dismiss'." *Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F. Supp. 3d 735, 744 (E.D. Mich. 2014) quoting *Fabian v. Fulmer Helmets Inc.,* 628 F.3d 278, 281(6th Cir. 2010) quoting *Iqbal*, 556 U.S. at 678.

> **B.**    **Plaintiffs Have Satisfied the Standing And Pleading Requirements Applicable To The Patent Infringement Claim In Count I of the Second Amended Complaint.**
>
> 1.    Plaintiffs Satisfy Standing Requirements Applicable To The Patent Infringement Claim.

Whether a plaintiff has standing to sue for patent infringement is a legal question. *Fabpro Oriented Polymers, Inc. v. McCormick*, 2002 U.S. Dist. LEXIS 9224 (W.D. Mich. May 7, 2002), citing *Lans v. Digital Equipment Corp.*, 252 F.3d 1320, 1328 (Fed. Cir. 2001). "The general rule is that one seeking to recover money damages for infringement of a United States patent (an action 'at law') must have held the legal title to the patent during the time of the infringement." *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1579 (Fed. Cir. 1991). "The

sole exception to the rule that only he who is the owner of the patent at the time of the infringement can sue for damages . . . is when such owner assigns the patent and also the claim for past infringements to the same person." *Crown Die & Tool C. v. Nye Tool & Machine Works*, 261 U.S. 24, 43, 67 L. Ed. 516, 43 S. Ct. 254, 1923 Dec. Comm'r Pat. 651 (1923). Alternatively, the plaintiff must be a licensee who holds "all substantial rights" in the patent. *H.R. Technologies, Inc. v. Astechnologies, Inc.*, 275 F.3d 1378, 1384 (Fed. Cir. 2002.)

As a threshold matter, 35 USC §100(d) states that "the word patentee includes not only the patentee to whom the patent was issued, but also the successors in title to the patent." To that end, 35 U.S.C. §261 provides that "applications for patents, patents, or any interest therein shall be assignable in law by an instrument in writing." Thus, Ajax has standing to bring the patent claims if it meets the definition of "patentee" under 35 USC §100(d) and if it has achieved that status "by an instrument in writing as described in 35 U.S.C. §261. The evidence demonstrates that Ajax has met both elements. Indeed, as a matter of law, both Equipment and Ajax had exclusive and uncontested title to the '709 patent.

When the application (U.S. 11/457,874) for the '709 patent was filed in 2006, it was owned by the Australian company, GEF Holdings Pty Ltd. ("GEF"). In January of 2007, however, GEF transferred its rights in the pending application to Equipment.[3] The '709 patent issued in May 2008. (*See* Doc. 37-4, Patent.) In November 2012, GEF issued a Deed of Assignment to Equipment, which was filed with the U.S. Patent and Trademark Office on July 6, 2015. (Doc.

---

[3] In both their Motion and attorney Comiskey's Declaration, Defendants misrepresented the evidence produced by Plaintiffs in support of their ownership and authority in the '709 Patent. Indeed, as demonstrated by the Declaration of Robert W. McIntyre, which is being filed contemporaneously with this Memorandum, Plaintiffs' Supplemental Production of Documents pursuant to Local Rule 3.2(d) included the asset purchase agreement between GEF and Equipment. That document which was conspicuously absent from Defendants' Motion and supporting documents expressly provided for the transfer of all patents and patent applications. In fact, the written agreement between GEF and Equipment not only identified other non-US patents transferred but also contained broad provisions intended to transfer all intellectual property, including the application for the patent at issue here.

38-3, Deed of Assignment.)  On January 31, 2007, Equipment expressly conveyed the authority to do so in a writing provided to Ajax.  (A copy of the January 31, 2007 letter to Ajax is attached to Defendant's Motion at Exhibit C, Doc. 38-5.)  Consequently, Ajax had the right at the filing of the Complaint to enforce the '709 patent registered in the name of Equipment.  (Doc. 37, Second Amended Complaint at ¶¶21,22.)

As noted above, 35 U.S.C. §261 provides for the assignment of patents and patent applications. Thus, under 35 U.S.C. §100(d), it is clear that the successive written agreements between GEF and Equipment and the letter issued by Equipment to Ajax make Equipment and Ajax  "successors in title to the patent."  In this regard, it is well settled that successors in title to a patentee have the right to enforce a patent, and such rights can be determined either by the writing transferring the patent rights, and/or by the intent of the parties.  *Vaupel Textilmashin Kg v. Meccanica Euro Italia SpA,* 944 F.2d 870, 875 (Fed. Cir. 1991) (holding that the documents although not constituting a formal assignment of the U.S. patent, were a grant of all substantial rights and permitted Vaupel to sue).   In addition, as the court in *Bell Intercontinental Corp. v. United States* noted,

> Whether a transfer constitutes a sale or license a sale or license is determined by the substance of the transaction and a transfer will suffice as a sale if it appears from the agreement and surrounding circumstances that the parties intended that the patentee surrender all his substantial rights to the invention.

180 Ct. Cl. 1071, 1077, 281 F.2d 1004, 1011 (1967).

Here, the surrounding circumstances clearly demonstrate Equipment's intent to transfer exclusive rights to make, use, sell and  enforce the '709 patent to Ajax.   First, Ajax has been the sole manufacturer and seller of the OneSide fastener products throughout the world and represents its protection by the '709  Patent.  (Doc. 37, Second Amended Complaint, ¶¶17, 21, 23.)   Next,

the steps necessary to issue, maintain, and transfer rights to the patent have been performed by or on behalf of Ajax. Consistent with the terms of the January 2007 letter, for nearly nine years, Ajax has exclusively manufactured and sold the OneSide and has held it out as a patented product. (Doc. 37, Second Amended Complaint at ¶¶17, 21, 23.) And, critically, Defendants did likewise from 2012 until September 2015.

In summary, each element required by law to confer upon Ajax the right to maintain this action are present. Specifically, (i) each transfer of rights is by written contract, (ii) the rights transferred are identified in the contracts, and (iii) the conduct of each of the transferors and transferees clearly demonstrates the intent of each to transfer the rights in the '709 patent, successively to Ajax. Thus, there is nothing in the record which even creates an inference that the January 31, 2007 Equipment-Ajax Agreement, supported by the subsequent conduct of GEFH, Ajax, and Equipment did not intend and also operate, to exclusively transfer all of the rights under the '709 application and the eventual '709 patent to Ajax. Ajax enjoys the exclusive right to enforce the '709 patent.

       2.    <u>AllFasteners' Claim That A Method Claim Cannot Be Infringed By The Manufacture And Sale Of A Product Is Incorrect.</u>

AllFasteners' assertion that they do not infringe the '709 patent because they do not practice the method set forth in the '709 patent is incorrect. To the contrary, AllFasteners does, in fact, practice the method. Not only that, but AllFasteners induces third parties to practice the method by ordering others to manufacture the infringing product so they [AllFasteners] can compete with Ajax in the U.S. market by inducing its customers to practice the '709 method using the NexGen products.

AllFasteners' conduct is clearly prohibited by 35 U.S.C. §271(b), which provides that "[w]hoever actively induces infringement of a patent shall be liable as an infringer." But its

13

liability does not end there. 35 U.S.C. §271(c), codifies the long established doctrine of contributory infringement. It provides that:

> [w]hoever sells a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use, shall be liable as a contributory infringer.

*See also Ricoh Co. Ltd v Quanta Storage Inc.,* 550 F3d 1325, 1337 (Fed. Cir. 2008 (analyzing whether the noted forms of contributory infringement could occur under a circumstance that would create liability for the maker of a device that is used to infringe upon a method patent and finding 35 U.S.C. §271(c) applied.)

Applying the foregoing law to the present case begs the following questions:

1. Are the NexGen2 bolts and tools used in practicing the method set forth in the patent?

2.  Is there any other way to practice the method of the '709 patent with some other device?

3. Do the offending devices have "any substantial non-infringing use"; and/or are they "a staple article or commodity of commerce suitable for substantial non-infringing use"?[4]

4. Does the Defendant know that the offending devices it sells will be used to practice the method of the '709 patent?

As demonstrated below, the answer to each of these questions clearly supports Ajax's contentions in this case.

First, practicing the unique method claimed in the '709 patent requires using only those bolts and tools having the unique split washer, button head, washer and nut retention feature and the movable means to attach and detach the installation tool. There can be no other way to practice the '709 method. In this regard, Defendants' website provides extensive details about the unique characteristics of the bolts, tools, and applications in cell tower construction, *all of which are*

---

[4] *See e.g. Ricoh*, 550 F.3d at 1337), quoting 35 U.S.C. §271(c).

14

*required* to practice the method of the '709 patent. (Doc. 37-10, Exhibit J to Second Amended Complaint, p.3.)

Next, as explained above, Defendants have chosen to exactly replicate the OneSide bolts and tools to sell to those practicing the method. This fact, combined with Defendants and Plaintiffs' public representations that both their products neither have "substantial non-infringing uses" nor are "a staple article or commodity of commerce suitable for substantial non-infringing use" establishes that Defendants make (have made) and sell unique and specialized products that have but one use – to practice the method of the '709 patent.

Lastly, it is uncontested that Defendants have known since at least 2012 that there is no other use of the NexGen2 products except to practice the method of the '709 patent.  Having been one of only two United States selling agents from 2012 to mid-2015, they are obviously aware that the NexGen2 products will be used for practicing the method of the '709 patent and AllFasteners developed them for no other purpose or use than practicing the method of the '709 Patent.  (*See* Doc. 37, Second Amended Complaint, ¶¶30, 33, 38.)   As the *Ricoh* court noted:

> assuming direct infringement is found, [defendant] would be liable under §271(c) if it imported into or sold within the United States a bare component *** that had no use other than practicing the methods of the *** patents.  Such a component, especially adapted for use in the patented process and with no substantial infringing use, would plainly be "good for nothing else" but infringement of the patented process.

*Ricoh*, 550 F.3d at 1337), citing *MGM Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 932, 125 S.Ct. 2764 (2005).

Based upon AllFasteners' conduct and that fact that the NexGen2 products have no substantial non-infringing uses, AllFasteners cannot avoid liability for infringement though its own conduct in selling the NexGen2 products.  And, it cannot escape liability for inducing others to

manufacture them.  *See also Grokster*, 545 U.S. at 918, 125 S.Ct. 2764 ("Where evidence goes beyond a product's characteristics or the knowledge that it may be put to infringing uses, and shows statement or actions directed to promoting infringement, Sony's staple-article will not preclude liability.")

AllFasteners' promotional videos and representations made on its website clearly show that Defendants sell the offending devices to their customers for the sole purpose of practicing the method of the '709 patent.  Therefore, Defendants' contentions that Ajax did not plead facts plausibly showing that AllFasteners specifically intended that a third party would infringe upon the patent and knew that the third party's acts would constitute infringement is unsupportable.  Simply, there is no possible use for the NexGen or NexGen2 products other than practicing the '709 method.  Thus, each and every sale of the infringing products constitutes both contributory infringement and an inducement to infringe for which Defendants are liable.

Additionally, because AllFasteners does not manufacture the products themselves, they caused vendors to supply parts for assembly into bolt kits, so they can be sold with one or more installation tools thereby inducing Defendant's vendors to provide the devices which are used to practice the method of the '709 patent.  (Doc. 37, Second Amended Complaint, ¶¶62,63.)

### 3.     Plaintiff Properly Stated a Cause of Action.

Defendants next assert that Plaintiff's do not state a claim for infringement of the '709 Patent "because the NexGen products do not have a moveable member."  (Doc. 38, Defendants' Motion at p.13.)  This contention is both premature and incorrect.

First, the Court's Order regarding Status Conference (Doc. 31) sets forth the parties' agreement on the schedule of claims construction as agreed upon by the parties in the Report of the Parties' Planning Meeting (Doc. 30).  As such, claims construction has not yet been determined

by the Court.  Next, Ajax's and All Fasteners' Proposed Claims Constructions include the following terms: movable member, bolt engagement portion, tool engagement portion, engage along an interface, engages said bolt engagement portion and said tool engagement portion across said interface, separation of said bolt engagement portion of said tool engagement portion, is prevented by a movable member, and detaching said tool from said fastener; all of which remain for the determination of the Court.  Thus, any assertions based on AllFasteners proposed "claims construction" remain factual matters for future determination by the Court and as such cannot be decided by a Motion to Dismiss

Nevertheless, the materials presently available to the Court fully support Plaintiffs' position. First, the NexGen2 tool comprises several discrete elements: the handle, the special "cut-out/wasted" section where the folded inside washer is located during the passage of the bolt through the tower wall by the tool, and a movable dual threaded insert that is partially screwed into the end of the handle and partly exposed to engage the bolt. (*See* Doc. 37-10 and Doc. 37-11, Exhibits J and K to  Second Amended Complaint, respectively.)  Both the OneSide which incorporates the inventions in the '709 patent and the NexGen tool all have a part of the tool *that has to move with respect to the bolt*, in order to perform the function of connecting the tool to the bolt to install the bolt in the tower and then disconnecting and removing the tool after the nut is preliminarily tightened where the tool end is moved to connect and disconnect the bolt from the tool.  (*See* Doc. 37-10 and Doc. 37-11, Exhibits J and K to  Second Amended Complaint, respectively.)

4.    <u>Infringement Under the Doctrine of Equivalents.</u>

Defendants' final assertion, with respect to the patent claim, is that the presence of an equivalent structure found in prior art undermines the patent.  This claim, however, is not

supported.  Here, prior Ajax foreign filings which show a general type of movable threaded connection between the bolt and tool do not affect the infringing equivalent structure of the NexGen2 movable member tool.  In any event, "[t]he mere existence of an element in the prior art [does not] automatically preclude [Plaintiffs] from asserting a scope of equivalency sufficient to encompass the corresponding element in the accused device."  *Wald et al v Mudhopper Oil Field Services Inc.*, 2006 U.S. Dist. LEXIS 51666 (W.D. Okla. July 27, 2006).   In *Wald*, the court held that

> An element of the accused product is equivalent to a claim limitation if the differences between the two are insubstantial. The analysis focuses on whether the element in the accused device performs substantially the same function in substantially the same way to obtain the same result as the claim limitation.

*Id.*, (citing *Aquatex Indus., Inc. v. Techniche Solutions,* 419 F.3d 1374, 1382 (Fed. Cir. 2005) (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097, 1050 Dec. Comm.'r Pat. 597 (1950).)

Furthermore, as the U.S. Supreme Court has acknowledged,

> The language in the patent claims may not caption every nuance of the invention or describe with complete precision the range of its novelty.  If patents were always interpreted by their literal terms, their value would be greatly diminished.   Unimportant and insubstantial substitutes for certain elements could defeat the patent, and its value to invetors could be destroyed by simple acts of copying.  For this reason, the clearest rule of patent interpretation, literalism, may conserve judicial resources but is not necessarily the most efficient rule.  The scope of a patent is not limited to its literal terms but instead embraces all equivalents to the claims described.

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kaburshiki Co. Ltd.*, 535 U.S. 722, 731-732, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002).

Applying the holding in *Wald,* this Court is requested to consider the actual equivalent structures in its analysis of the NexGen2, specifically noting that, excepting the means to attach

18

and detach the bolt and tool, every other feature and structure of the NexGen2 is identical to the OnseSide.  Therefore, with regard to this respect of the two tools and bolts, and for the NexGen2 (i) the means used is the movable male thread which engages and disengages from the bolt, (ii) the method is the required relative movement between the tool and bolt which both attaches and detaches the tool while facilitating the concurrent installation of the washers and nut, and (iii) the result is to perform the installation of a bolt, washers, and nut into a blind joint and thereafter make it available for final tensioning.  There is no question that the NexGen2 infringes under the three well-settled definitions of the doctrine of equivalents.

Further, Defendants assertion that the prior art in PCT application WO 00/19113 which shows a type of threaded connection between the bolt and tool precludes that application of the doctrine of equivalents is unsupportable.  As the court in *Nat'l Steel Car Ltd. v. Canadian Pac Ry Ltd,* 357 F3d 1319, 1337 (Fed. Cir. 2004) noted,

> Even if all of its limitation could be found in the total set of elements contained in the prior art references, a claimed invention would not be obvious without a demonstration of the existence of a motivation to combine those references at the time of the invention.[Internal citation omitted.] This requirement prevents a court from labeling as obvious in hindsight a solution that was not obvious to one of ordinary skill at the time of the invention. [Internal citation omitted].

Based on the foregoing, there is no merit to Defendants' arguments that the patent claims should not proceed.  Virtually every element of infringement has been demonstrated, and the standing issue regarding Ajax' right to enforce the '709 patent has been clearly demonstrated.

### C.     Plaintiffs Have Satisfied the Standing and Pleading Requirements Applicable To Its Claims Under the Lanham Act

The Lanham Act creates a civil cause of action for trademark and trade dress infringement. 15 U.S.C. §1125(a)(1).   In order to invoke the protections of the Lanham Act, a plaintiff must understandably come within the zone of interests of the statute and its injuries must be proximately

caused by the violations.  *Lexmark International Inc. v. Static Control*, 134 S.Ct. 1377, 188 L.Ed.2d 392; 2014 US LEXIS 2214 (2014).   A review of the Second Amended Complaint demonstrates that Ajax has properly asserted a claim for relief under the Lanham Act for violations under 15 U.S.C. §1125(a)(1)(a) and 15 U.S.C §1125(a)(1)(B) for which it is entitled to seek relief in this action.

There can be no doubt that Plaintiffs, particularly Ajax, are in the zone of interest under the Lanham Act as it expressly prohibits the type of conduct for which Plaintiffs seek relief in this case.  15 U.S.C. §1125(a)(1)(A) and (B); 15 U.S.C. §1927 (setting forth the intent of the statute to, among other things, protect persons engaged in commerce against unfair competition and prevent fraud and deception in commerce.)[5]

The proximate cause requirement requires a plaintiff bringing a claim under Section 43(a) to show "economic or reputational injury flowing directly" from the defendant's alleged violation of the statute. *Lexmark*, 134 S.Ct. at 1391. *See also Belmora LLC v. Bayer Consumer Care AG*, 84 F. Supp.3d 490, 500 (E.D. Va. 2015).  In this case, Plaintiffs allege that by marketing and selling an inferior product that has been designed to appear visually indistinguishable from the Ajax OneSide, AllFasteners, once a semi-exclusive re-seller and now a direct competitor of Ajax, has diluted Ajax's business identity, diluted the OneSide product identity, and damaged Ajax's reputation.   (Doc. 37, Second Amended Complaint, ¶98.)   Traditional proximate causation principles support the notion that a defendant who denigrates the reputation of a plaintiff's product has proximately caused the injuries.  *Lexmark*, 134 S.Ct.1393-1394.

Based upon the facts alleged, Plaintiffs are authorized to sue under the Lanham Act, and

---

[5] *See Am. Council of Certified Podiatric Physicians and Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d 606, 613 (6th Cir. 1999) (finding that the statute prohibits misleading commercial  speech about one's own products or the products of a competitor that is likely to influence and deceive the intended audience.); *TherDow Corning Corp. v. Jie Xiao*, 2011 U.S. Dist. LEXIS 54619, 101 U.S.P.Q.2D (BNA) 1802 ( E.D. Mich. May 20, 2011).

they have sufficiently pled their claims for relief.

       1.     <u>Plaintiffs Have Sufficiently Pled A Claim Of Trade Dress Infringement.</u>

Turning first to Ajax's claim for trade dress infringement, trade dress refers to "the image and overall appearance of a product." *Ferrari S.P.A. Esercizio Fabriche Automobili E Corse v. Roberts*, 944 F.2d 1235, 1238-1239 (6th Cir. 1991); *citing Allied Mktg. Group, Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 812 (5th Cir. 1989).  It is "essentially a product's total image and overall appearance ... as defined by its overall composition and design, including size, shape, color, texture, and graphics." *Schutte Bagclosures Inc. v. Kwik Lok Corp.,* 48 F. Supp.3d 675, 696 (S.D.N.Y. 2014), quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 31 (2d Cir. 1995)

Here, the allegations in Count II of the Second Amended Complaint assert (1) without Ajax's consent, AllFasteners utilized Ajax's brand and trade dress as it appeared on product packaging, trade show exhibits, printed materials, web pages, and a YouTube video through mid-September 2015,  (Doc. 37, Second Amended Complaint, ¶42); and (2) the marketing campaign for the NextGen2 utilizes web pages and videos that are substantially identical to both Ajax's own advertising material as well as the AllFasteners' web pages for the OneSide brand product line. (Doc. 37, Second Amended Complaint, ¶¶55,56.) And, to support its assertions, Ajax has included examples of the relevant trade dress at issue in the Second Amended Complaint at Exhibits J and K thereto.  (Doc.37-10 and 37-11, respectively.)

In order to assert a claim for trade dress infringement, a plaintiff must plead

> 1) that the trade dress in question is distinctive in the marketplace, thereby indicating the source of the good it dresses, 2) that the trade  dress is primarily nonfunctional, and 3) that the trade dress of the competing good is confusingly similar.

*Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc.*, 280 F.3d 619, 629 (6th Cir.

2002).  Moreover, a plaintiff must identify the features in its product that comprise its trade dress. *Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F. Supp. 3d 735, 745 (E.D. Mich. 2014); *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 381 (2d Cir. 1997).   However, at the early stages of litigation, including photographs of the relevant trade dress in the complaint, as Ajax has done here, satisfies the general requirement that the elements of trade dress be specifically identified and articulated in a list. *See Abercrombie*, 280 F.3d at 635; *Dayco Prods., LLC v. Dorman Prods.,* 2010 U.S. Dist. LEXIS 102785, 2010-2 Trade Cas. (CCH) P77, 291, 2010 WL 3855221 (E.D. Mich. Sept. 28, 2010).

Ajax properly alleged the elements necessary to pursue its trade dress claim.  Indeed, the Complaint and Second Amended Complaints assert that patented inventions in the OneSide are well known in the industry and that, as a result of the reputation in the marketplace for the OnseSide,  AllFasteners was able sell significant amounts of the OneSide products in the United States. (Doc.1, Complaint at ¶¶35,40; Doc. 37, Second Amended Complaint at ¶¶38, 40, 47.) Thus, Plaintiffs have sufficiently alleged that the OneSide is distinctive in the marketplace.

A feature is not functional where it is "merely an ornamental, incidental, or arbitrary aspect of the device." *Mertik Maxitrol GMBH & Co. KG v. Honeywell Techs. Sarl,* 2012 U.S. Dist. LEXIS 29264 (E.D. Mich. Mar. 6, 2012), quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.,* 532 U.S. 23, 30, 121 S. Ct. 1255, 1260, 149 L. Ed. 2d 164 (2001).   In this case, a review of promotional and marketing materials demonstrates that AllFasteners has utilized the non-functional aspects of the OneSide images in marketing the NexGen2, including the typeface, color scheme, graphics for the OneSide brand and descriptions of the features, attributes, and advantages of the product.[6] These items are not functional.

---

[6] "[I]nvoking the specific phrase 'non-functionality' is not necessary to maintain a trademark infringement claim." *Int'l Diamond Imps., Inc. v. Oriental Gemco Ny, Inc.,* 64 F. Supp. 3d 494, 522 n.188 (S.D.N.Y. 2014).

As for the third element, both the Complaint and the Second Amended Complaint sufficiently allege the likelihood of confusion by including allegations setting forth (1) the similarities in the AllFasteners webpage designs and installation videos, which are visually indistinguishable in appearance from the OneSide, (2) the competitive proximity between the OneSide and NexGen2 products in the US market, (3) AllFasteners' bad faith in utilizing the trade secret information supplied by Ajax to develop a competing product, and (4) the inferior quality of AllFasteners' NexGen2 products. (Doc. 1, Complaint at ¶35,40,41,44-49,66-68,70,72,84; Doc. 37, Second Amended Complaint at ¶¶38, 41, 47, 48, 51-53, 56, 57, 58, 77, 82, 84, 86.)

Based upon the foregoing, the trade dress claim has been sufficiently pled.

2.    Plaintiffs Have Sufficiently Pled A Claim Of False Advertising.

Ajax has also properly pled claims for false designation as to nature and quality.   In order to assert a claim under 15 U.S.C. §1125(a)(1)(B), a plaintiff must allege that: (1) the defendant has made false or misleading  statements of fact concerning his product or another's; (2) the statement actually or tends to deceive a substantial portion of the intended audience; (3) the statement is material in that it will likely influence the deceived consumer's purchasing decisions; (4) the advertisements were introduced into interstate commerce; and (5) there is some causal link between the challenged statements and harm to the plaintiff. *Mike Vaughn Custom Sports*, 15 F. Supp.3d at 750, citing *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 322-23 (6th Cir. 2001).

Here, both the Complaint and Second Amended Complaint provide detailed allegations supporting their claims.  Indeed, Ajax alleged that AllFasteners' misrepresents its NexGen2 as "a grad A-490" fastener that is manufactured in the USA, that AllFasteners provided improper product certifications, and that AllFasteners misrepresents its product as conforming to legal and

industry standards.   (Doc.1, Complaint at ¶¶51,56,58-61,63,81; Doc. 37, Second Amended Complaint, ¶¶59,66,68-71,74,85,95.)  Ajax also alleged that AllFasteners misrepresentations are made on its website and on YouTube videos and are designed to gain an improper and prohibited advantage in the U.S. market and that, as a result, AllFasteners has diluted Ajax's business identity, the OneSide product identity and damaged Ajax's business reputation.  (*Id.* at ¶85.)  Based upon these allegations, Ajax has sufficiently pled claim for false advertising.

> **D.** **Plaintiffs Have Satisfied the Standing and Pleading Requirements Applicable To Its Claims Under Ohio's Uniform Trade Secret Act.**

Ohio Rev. Code § 1333.61 defines a "trade secret" to include

> "any business information or plans, financial information, or listing of names, addresses, or telephonic numbers," that both "derives independent economic value . . . from not being generally known" to other persons who could obtain economic value from its disclosure or use; and "is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

Ohio Rev. Code § 1333.61(D).  In order to succeed on a claim for misappropriating trade secrets, a plaintiff must establish: "(1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Heartland Home Fin., Inc. v. Allied Home Mortgage Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008); *Wellington Res. Group LLC v. Beck Energy Corp.,* 2013 U.S. Dist. LEXIS 134835 (S.D. Ohio Sept. 20, 2013).  The question of whether information constitutes a trade secret is a highly fact-specific inquiry. *DeBoer Structures Inc. v. Shaffer Tent & Awning Co.,* 233 F. Supp. 2d 934, 948 (S.D. Ohio 2002).

Here, Ajax has alleged the existence of trade secret information and the extent to which it is known outside the business through its assertions that the trade secret information at issue consisted of its technical information, designs, processes, pattern formulas, methods and

techniques and that Ajax specifically granted AllFasteners access to its engineering information, manufacturing technology and know-how, application information, and material specifications. (Doc. 1, Complaint at ¶¶41,49,65; Doc. 37, Second Amended Complaint, ¶¶46, 51, 102.)  Under the notice pleading requirements of Fed. R. Civ. P. 8, Ajax is not obliged to plead details of its trade secrets with any greater specificity. *See e.g. Wellington Res. Group LLC,* 2013 U.S. Dist. LEXIS 134835.

Ajax has also addressed the precautions it has taken to maintain the secrecy of its trade secrets through allegations that access to the information was provided pursuant to the promises entered into under the Confidentiality Agreement.  (Doc. 1, Complaint at ¶39; Doc. 37, Second Amended Complaint, ¶46.)  And, AllFasteners suggestion that Ajax's authorization to utilize certain confidential information for the limited purpose of developing business and sales for the OneSide somehow the Agreement is meritless.  By its terms, the Agreement spelled out those circumstances by which confidential information could be disclosed and to whom, and none of those exceptions permitted AllFasteners, its employees, agents or representatives to utilize Ajax's confidential information to develop an infringing and competing product.    (Doc. 37-8, Confidentiality Agreement.)

And, lastly, Ajax has satisfied the misappropriation element through its assertions that AllFasteners misused its position as a re-seller of the OneSide in order to obtain access to Ajax' confidential and trade secret information so as to develop a counterfeit, competing version of the OneSide.  (Doc.1, Complaint at ¶41,45,69; Doc. 37, Second Amended Complaint, ¶¶48,57, 76.)

Taken as true, these allegations support and constitute a claim for misappropriation of trade secrets.  Therefore, Plaintiffs have satisfied the pleading requirements and the claim should survive motion to dismiss.

25

E.     **Plaintiffs Have Satisfied the Standing and Pleading Requirements Applicable To Its Claims For Breach of Contract.**

Ajax has adequately asserted a breach of contract claim against AllFasteners.  As indicated in the Second Amended Complaint, Ajax does business as Ajax Fasteners as well as Ajax Engineered Fasteners.  (Doc. 37, Second Amended Complaint, ¶4.)  Both Ajax and its parent company, Specifix, were parties to the Confidentiality Agreement. Moreover, AllFasteners is an affiliate of AllFasteners Pty. Ltd., an Australian company, and all of the AllFasteners entities operate under the common control of one or more officers, including Michael Strange.  (Doc. 37, Second Amended Complaint, ¶10.)

By its terms, the Confidentiality Agreement prohibits the dissemination of proprietary information and it applies to "all employees, servants, agents and successors of the parties hereto and each shall be responsible for the fulfillment of its obligation under this Agreement on the part of the employee."  (Doc No. 1-9, Confidentiality Agreement, ¶6; Doc. 37-9, Confidentiality Agreement). The Confidentiality Agreement was executed by Michael Strange.  *Id.*  Thus, at a minimum, the confidentiality provisions applied to any employees, agents or servants of both AllFasteners Pty. Ltd. and AllFasteners, including Michael Strange.  *Id.* Taken as true, the allegations in the Complaint sufficiently demonstrate that Ajax has the right to sue under the Confidentiality Agreement, and that it its breach of contract claim against AllFasteners is properly asserted.

## IV.    CONCLUSION

Plaintiffs assert that, for all of the foregoing reasons, they have sufficiently carried their burden of proof under Art.III, Civil Rule 12(b)(1), and 12(b)(6).  And, therefore, AllFasteners' Motion to Dismiss should be overruled.

Dated:   December 1, 2015

Respectfully submitted,


*/s/ Robert W. McIntyre*
ROBERT W. McINTYRE (0006768)
ANGELA M. LAVIN (0069604)
PETER A. HOLDSWORTH (0075211)
Wegman Hessler & Vanderburg
6055 Rockside Woods Blvd, Suite 200
Independence, OH  44131
Telephone:  (216) 642-3342 / Fax:  (216) 642-8826
Email: rwmcintyre@wegmanlaw.com
amlavin@wegmanlaw.com
pxholdsworth@wegmanlaw.com
*Attorneys for Plaintiffs*

27